**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EUGENIO CARMONA, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

LOMA NEGRA COMPANIA INDUSTRIAL ARGENTINA SOCIEDAD ANONIMA, LOMA NEGRA HOLDING GMBH, SERGIO FEIFMAN, MARCOS ISABELINO GRADIN, RICARDO FONSECA DE MENDOCA LIMA, LUIZ AUGUSTO KLECZ, PAULO SERGIO DE OLIVEIRA DINIZ, CARLOS BOERO HUGHES, DIANA MONDINO, and SERGIO DANIEL ALONSO,

Defendants.

**CASE No.: 1:18-cv-11323-LLS**

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**CLASS ACTION**

Lead Plaintiff Sandor Karolyi and named plaintiff Eugenio Carmona ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Loma Negra Compania Industrial Argentina Sociedad Anonima ("Loma Negra" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of all persons or entities who purchased or otherwise acquired Loma Negra American Depositary Shares ("ADS") pursuant or traceable to the F-1 registration statement, incorporated *in pari materia* F-6 registration statement, and related "Prospectus" (collectively, "Offering Documents"), issued in connection with Loma Negra's November 2017 initial public stock offering ("IPO" or "Offering") and asserting claims under §§ 11, 12, and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77 *et seq*., against Loma Negra and certain Loma Negra officers and directors. In addition, this securities class action alleges on behalf of all purchasers of Loma Negra ADS from November 2, 2017 through May 23, 2018, both dates inclusive, claims under §10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78, *et seq*., and Rule 10b-5, promulgated thereunder against Loma Negra and certain of its officers.

2. Loma Negra is a South American manufacturer and distributor of cement, concrete, and other building materials. Headquartered in Buenos Aires, Argentina, Loma Negra conducted its IPO in New York, and its ADS are listed on the New York Stock Exchange ("NYSE") under the ticker symbol "LOMA."

3. In November 2017, Defendants commenced the IPO, issuing approximately 53.5 million ADS to the investing public at $19 per share, all pursuant to the Offering Documents.

4. In advance of the IPO, Defendants touted Loma Negra, the largest cement producer in Argentina, as being perfectly positioned to benefit from the improving Argentine economy, and the coming boom in demand for cement and related materials.

5. In the Offering Documents and public statements thereafter, Defendants represented that new Argentine president, Mauricio Macri's ("Macri"), promise of massive

anticipated infrastructure and public works spending spurred a boom in demand for cement. For example, in the Offering Documents, Defendants cite statistics, showing that investment in transportation infrastructure and public works projects in Argentina would total approximately US$155 billion over the coming ten years and stating that Loma Negra would benefit both from increased government spending and from more robust private spending that Argentina's recovering economy would generate.

6. Defendants did not disclose to the market, however, that at the time of their statements touting Loma Negra's expected benefit from expanded government infrastructure spending, it was known within the construction industry that that Macri administration was scaling back its plans to fund public works projects, and that prior to the IPO, the government had fallen behind on, or stopped altogether, its payments to government contractors.

7. In their public statements and filings with the SEC, Defendants continued to tout increased government infrastructure and public works projects spending as driving increased demand for Loma Negra's products, even while the evidence grew that the government was not making payments to contractors, and was in fact likely to cut infrastructure spending. When the truth emerged in May 2018 about the true state of government funding of infrastructure and public works projects, the price of Loma Negra ADS fell by $2.75, a drop of more than 16%.

8. In its Offering Documents and public statements throughout the Class Period, Defendants also misrepresented the nature of Loma Negra's anticompetitive practices within the cement industry. Between May 22, 2018 and May 24, 2018 on reports that the Argentinian National Commission for the Defense of Competition (CNDC) had accelerated an "investigation against the cement companies for alleged collusion and alleged oligopolistic behavior," Loma Negra ADS fell an additional 24%.

9. Finally, Defendants made further false and misleading statements in the Offering Documents concerning the involvement of its corporate parent, Camargo Corrêa, in a bribery and kickback scandal. Specifically, Defendants did not disclose to investors that Camargo Corrêa had participated in a scheme to bribe officials in Argentina to secure a bid for the building of the Bicentenario water treatment plant, and that Argentine officials were conducting an ongoing investigation into the scheme.

10. As a direct and proximate result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADS, Plaintiffs and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o), and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Loma Negra conducted its IPO in this Judicial District, and its ADS are listed on the NYSE, located within this Judicial District. Additionally, substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

14. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15. Lead Plaintiff Sandor Karolyi purchased Loma Negra ADS pursuant or traceable to the IPO and was damaged thereby. Plaintiff's PSLRA certification was previously filed with the Court (ECF No. 17-2) and is incorporated in its entirety by reference herein. Named Plaintiff Eugenio Carmona purchased Loma Negra ADS pursuant or traceable to the IPO and was damaged thereby. Plaintiff Carmona's PSLRA certification was previously filed with the Court (ECF No. 20-2) and is incorporated in its entirety by reference herein.

16. Defendant Loma Negra is a South American manufacturer and distributor of cement, concrete, and other building materials. Incorporated under the laws of Argentina and headquartered in Buenos Aires, Loma Negra conducted the IPO in New York, and its ADS are listed on the NYSE under the ticker symbol "LOMA."

17. Defendant Loma Negra Holding GmbH (the "Selling Shareholder") is an Austrian limited liability company that, prior to the IPO, owned 99.4% of Loma Negra's outstanding capital stock. The Selling Shareholder is indirectly owned and controlled by InterCement, Loma Negra's controlling shareholder. InterCement in turn is controlled by Camargo Corrêa. In the IPO, the Selling Shareholder sold 51,730,000 ADS for gross proceeds of approximately $983 million. In the Prospectus, Defendants stated that the InterCement Group intended to use the net proceeds of the offering to repay indebtedness, as well as for working capital and other corporate purposes.

18. The following Defendants are referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Loma Negra investors, all motivated by their own and the Company's financial interests:

a. Defendant Sergio Faifman was, at the time of the IPO, Loma Negra's Chief Executive Officer and Vice President of Loma Negra's Board of Directors. At the time of the IPO, Defendant Faifman was also president of the board of directors of Yguazú Cementos S.A. (a Loma Negra subsidiary operating in Paraguay), and vice president of InterCement Participações S.A. (Loma Negra's controlling shareholder). Defendant Faifman was also Chief Financial Officer of Loma Negra from August 2012 to June 2015, and was Superintendent of Corporate Comptroller at InterCement Brasil from September 2010 until August 2012. Defendant Faifman reviewed, contributed to, and signed the Registration Statement.

b. Defendant Marcos Isabelino Gradin was, at the time of the IPO, Loma Negra's Chief Financial Officer, and was a member of Loma Negra's Board of Directors from August 2015 through July 2017. Defendant Gradin also serves on the Board of Directors of Yguazú Cementos S.A. and other Loma Negra affiliates, including Ferrosur Roca S.A., Cofesur S.A. and Recycomb S.A.U. Defendant Gradin reviewed, contributed to, and signed the Registration Statement.

c. Defendant Ricardo Fonseca de Mendoca Lima was, at the time of the IPO, President of Loma Negra's Board of Directors. Defendant Lima reviewed, contributed to, and

signed the Registration Statement. He served as a member of the Board from 2008 to 2015 and was Vice President of the Board from 2011 to 2015. At the time of the IPO, Defendant Fonseca de Mendonça Lima was also the CEO of InterCement since August 2015, the Company's controlling shareholder and owner and controller of the Selling Shareholder. At the time of the IPO he also served as chairman of Cimentos de Moçambique S.A. and as Manager of Camargo Corrêa Cimentos de Luxemburgo S.à.r.l. and Caue Finance Limited. At the time of the IPO, Mr. Fonseca de Mendonça Lima was also a member of the board of directors of Cimpor—Cimentos de Portugal SGPS, S.A. and chairman of its Executive Committee. Only one month after the IPO, on December 7, 2017, InterCement announced that Mr. Fonseca de Mendonça Lima had resigned from his positions at these companies. Prior to the IPO, Mr. Fonseca de Mendonça Lima had served as General Manager of InterCement Brasil, S.A. in 2008.

d. Defendant Luiz Augusto Klecz was, at the time of the IPO, a member of Loma Negra's Board of Directors. Defendant Klecz reviewed, contributed to, and signed the Registration Statement. Defendant Klecz has been Head of the Legal Department of InterCement Brasil since 2002, and between 2005 and 2008 was also the Legal Director of Loma Negra. Since 2011, Defendant Klecz has been the General Counsel for InterCement.

e. Defendant Paulo Sergio de Oliveira Diniz was, at the time of the IPO, a member of Loma Negra's Board of Directors. Defendant Diniz reviewed, contributed to, and signed the Registration Statement. Defendant Diniz has also been the Chief Financial Officer of InterCement Participações S.A since 2015.

f. Defendant Carlos Boero Hughes was, at the time of the IPO, a member of Loma Negra's Board of Directors. Defendant Hughes reviewed, contributed to, and signed the Registration Statement.

g. Defendant Diana Mondino was, at the time of the IPO, a member of Loma Negra's Board of Directors. Defendant Mondino reviewed, contributed to, and signed the Registration Statement.

h. Defendant Sergio Daniel Alonso was, at all relevant times, a member of Loma Negra's Board of Directors. Defendant Alonso reviewed, contributed to, and signed the Registration Statement.

19. The Individual Defendants each participated in the preparation of and signed (or authorized the signing of) the Registration Statement and the issuance of the Offering Documents. The Individual Defendants are strictly liable for the materially untrue and misleading statements incorporated into the Registration Statement. By virtue of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of Loma Negra's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and market investors.

20. Because of their positions with the Company, Defendants Faifman and Gradin were possessed the power and authority to control the contents of Loma Negra's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Defendants Faifman and Gradin were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to

them, Defendants Faifman and Gradin knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. Defendants Faifman and Gradin are liable for the false statements pleaded herein.

21. In the Company's Annual Report on Form 20-F, filed with the SEC on April 27, 2018, Defendants Faifman and Gradin both certified as follows:

> **CERTIFICATION PURSUANT TO**
> **SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**
>
> Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of Title 18, United States Code), each of the undersigned officers of Loma Negra C.I.A.S.A. (the "Company"), does hereby certify, to such officer's knowledge, that:
>
> The annual report on Form 20-F for the fiscal year ended December 31, 2017 of the Company (the "Report") fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

22. In addition, each signed a Certification, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, stating:

> **CERTIFICATION PURSUANT TO**
> **SECTION 302 OF THE**
> **SARBANES-OXLEY ACT OF 2002**
>
> 1. I have reviewed this annual report on Form 20-F of Loma Negra C.I.A.S.A.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the company and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) [Intentionally omitted]
>
> (c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

***Loma Negra's Background***

23. Loma Negra represents that it is "the leading cement producer in Argentina." Vertically integrated, Loma Negra "produce[s] and distribute[s] cement, masonry cement, aggregates, concrete and lime to wholesale distributors, concrete producers and industrial customers, among others." The cement products the Company produces "are primarily used in construction."

24. According to Defendants, at the time of the IPO, they expected construction "to be one of the fastest growing sectors of the Argentine economy in the next five years, resulting in an expected compound annual growth rate of 7.2% of the cement market. . . ." With six integrated cement plants in Argentina, just before the IPO, as of June, 2017, Loma Negra accounted for 45.4% of all cement sales volume in Argentina. In addition, it owns a majority stake in the second largest cement company in Paraguay with a 46% share of that country's cement market in the same time frame.

25. With respect to Loma Negra's corporate structure, prior to and after the IPO it was majority owned by Loma Negra Holding GmbH ("Loma Negra Holding"), an Austrian limited liability company. Prior to the IPO, Loma Negra Holding owned 99.4% of the Company's outstanding capital stock and was a "selling shareholder" in the IPO. In turn, InterCement Participações S.A. ("InterCement"), a privately held company with São Paulo, Brazil headquarters, wholly owned Loma Negra. According to the Offering Documents, "'[t]he InterCement Group is among the tenth largest cement producer globally (ex-China), by installed capacity, with

47.4 million tons of installed cement production capacity and 40 cement production facilities located in Latin America, Europe and Africa, as of December 31, 2016."

26. InterCement achieved control over Loma Negra Holding and Loma Negra in 2005 when InterCement's direct controller, Camargo Corrêa S.A. ("Camargo"), acquired Loma Negra for over $1 billion. Camargo directly controlled InterCement, the direct owner of over 99% of Loma Negra. At all times relevant hereto preceding the IPO, several individual defendants, including the President of Loma Negra's Board, defendant Fonseca de Mendonça Lima, were also high ranking executives within the InterCement Group.

27. Notwithstanding Loma Negra's longstanding operations as a major cement producer in Argentina, upon its integration into InterCement, it worked closely with its new parent, using "the InterCement Management System, or IMS, [its] Performance Programs," and, increasingly, co-processing. Of Loma Negra's relationship with InterCement, the Offering Documents stated, "[o]ur controlling shareholder, the InterCement Group, has a deep knowledge of the cement industry resulting from its global leading position and is deeply committed to its investments in Argentina and Paraguay." Defendants continued, that they "believe that InterCement Group's sponsorship gives us a competitive advantage, due to its continuing support and sharing of its global know-how."

28. According to Defendants, from 2005 through 2016, its integration into InterCement saw Loma Negra's sales volume increase by 52% from 3.3 million tons to 5 million. This increased output yielded "a compounded annual growth rate of 3.5%, while maintaining attractive margins and cash flow generation." The Company achieved this growth rate even as through years of "adverse macroeconomic conditions" beleaguered the Argentine economy. "We believe,"

Defendants stated in the Offering Documents, "our business has great operating leverage and will outperform other businesses during the expected recovery of the Argentine economy."

29. The Offering Documents tout economic recovery in Argentina as a foundational element of the "compelling opportunity for the construction sector and will jointly drive demand for cement, masonry cement, concrete, aggregates, lime and other building materials." Describing the years in Argentina before the 2015 election of President Macri, the Offering Documents expressed Defendants' understanding of "the low cement consumption per capita in Argentina relative to other Latin American economies, the limited number of major infrastructure investments in the country over the last decade, the local housing deficit and the growth prospects for the Argentine economy. . . ."

30. Low growth or recession had stalled the Argentine government's investment in infrastructure. "Over the past decades," the Offering Documents explain, "Argentina has experienced relatively little infrastructure development and a significant housing deficit: in 2016, this deficit amounted to 1.5 million residences in addition to 2.2 million residences in need of refactoring." Defendants correlated the relative paucity of Argentine infrastructure spending and private and public housing development to relatively low cement consumption. "Accumulated cement consumption in Argentina over the past 30 years, Defendants stated, "was 6.0 tons/inhabitant, according to data from the U.S. Minerals Yearbook, AFCP and Oxford Economics. Comparable figures for the United States, Mexico, Chile, Brazil, Colombia and Peru were 9.2, 8.9, 8.0, 7.1, 6.7 and 6.3 tons/inhabitant, respectively."

31. The Offering Documents detail a turning point in 2015 with the election of President Macri. "Since assuming office in December 2015," Defendants related, "the Macri administration . . . has announced and executed several structural economic, regulatory and policy

reforms. As a result, the economy has undergone certain fiscal, monetary and currency adjustments. . . . 2016 was a transition year from a political and economic perspective," Defendants continued, and "2017 is showing signs of strong recovery for the economy, particularly for the construction activity." For example, the Offering Documents cite that "[i]n the first eight months of 2017, cement consumption increased 10.4% year-over year. . . ."

32. Defendants attributed this rise in cement consumption to the September 2016 announcement that the Macri administration would invest up to US$260.0 billion "across multiple sectors of the economy, including improvement of existing roads and construction of new roads and highways, and the construction of dams and social housing, among other." The Offering Documents summarized projects Argentina's Investment and International Trade Agency had already identified as of March 2017 across nine key areas. Citing the AAICI Ingeniería y Construcción Industrial, "[t]he largest opportunities," Defendants told investors, "are found in the Transportation, Federal Infrastructure and Public Works sectors, which together account for required investments of over US$155 billion" during the coming ten years. Projects the Offering Documents anticipate the government will support are roads, freight and passenger rails, airports and ports, water and sanitation, and a public private partnership to create hydroelectric power production – all requiring cement.

33. Those investments, the Offering Documents stated, had already begun. Defendants informed investors that "the Argentine government launched a nationwide plan to renovate and operate existing roads and highways and to develop new ones for a total of US$55 billion, from 2017 through 2027." While Defendants avoided predicting the impact of the reforms and planned investments of the Macri government, stating "[i]t is not possible to predict such effect with certainty and such liberalization could also be disruptive to the economy and fail to benefit or harm

our business" they were bullish on the likely increase in cement sales. "We believe," Defendants stated, that "cement consumption in Argentina will grow above GDP for a number of years, driving cement consumption per capita to a structurally higher level, similar to that experienced by key regional peers such as Chile, Peru, Ecuador and Brazil." Indeed, according to Defendants, "infrastructure projects as well as residential and non-residential construction activity" would drive demand for cement, as it did in other Latin American markets. "In the near term," the Offering Documents stated, "the announced infrastructure projects coupled with new financing sources for residential construction are expected to drive incremental local cement demand."

34. The Offering Documents tout a pent up demand in Argentine cement production and the Company's preparedness to meet that demand. On this, Defendants based their belief "that cement consumption in Argentina has significant potential to grow before reaching the levels of developed nations. . . ." As a result, Defendants predicted robust growth in cement consumption in the near and medium term. In the Offering Documents, they expressed their belief "that the economic recovery of Argentina represents one of the most attractive opportunities in global emerging markets today." Noting a 10.7% "year-on-year increase in cement consumption in Argentina and correlating cement consumption to economic activity, Defendants "expect[ed] demand for cement to grow significantly within the next five years in Argentina. After two decades of capital scarcity across the industry," Defendants continued, "installed cement production capacity in the country is reaching its limit and we believe that Argentina will soon face a structural cement supply deficit."

35. A primary reason for the IPO was to raise capital to expand Loma Negra's cement production capacity. "We intend to use the net proceeds of the global offering to partially fund our growth plans primarily through the expansion of our L'Amalí plant, involving a total estimated

investment of approximately US$350 million. . . , and for working capital and other general corporate purposes," the Offering Documents state.

36. Loma Negra's L'Amalí plant is "strategically located" in Buenos Aires province, 50 kilometers from the city of Buenos Aires, near the Company's largest limestone reserves, and connected to the Company-owned Ferrosur Roca freight railway. Production began at L'Amali in August 2001. In the recent past, L'Amali's annual production capacity, the Offering Documents stated, was approximately 1.9 million tons of clinker and approximately 2.2 million tons of cement." Complying with "the highest standards of cement production technology and applicable environmental requirements," Defendants touted, that "[t]he L'Amalí plant produces cement in bulk at 493 tons per hour.

37. According to the Offering Documents, Loma Negra intended "to invest approximately US$350 million from 2017 to 2020 in the expansion of our L'Amalí plant, to increase our production capacity to meet expected additional demand for our products." The Offering Documents claim that Loma Negra began expanding L'Amali in August, 2017 and anticipated "execution time of approximately 31 months." Indeed, while hedging the timing for adverse results of operations, leverage ratios, available financing, and market conditions, the Offering Documents tout a more than 100% increase in L'Amali's capacity, stating that Defendants' "principal proposed expansion project during next three years is the expansion of our L'Amalí plant production capacity by an additional 2.7 million tons by the beginning of 2020." Defendants stated that "[o]nce the expansion is completed, L'Amalí is expected to become the largest cement plant in Argentina and one of the largest in Latin America, based on installed annual cement production capacity." The Offering Documents continued that "[t]his expansion of our L'Amalí plant will enable us to produce at a lower cost allowing us to reduce our overall

production costs plants which should positively impact our results." Defendants further stated that upon completing the expansion of L'Amali, "we estimate that L'Amalí will be the largest and most efficient cement plant in Argentina and one of the largest in Latin America based on installed capacity."

38. Thus, Defendants tied the IPO directly to their expansion of L'Amali to meet an anticipated surge in government infrastructure spending and private investment they anticipated the Macri government's reforms would spur. "We expect," Defendants stated, "that this expansion will allow us to meet the anticipated increase in cement demand in the upcoming years in Argentina, while we also expect this project to further streamline operations at L'Amalí, thereby reducing operating costs."

***The Offering Documents and Subsequent Company Filings Failed to Disclose a Material Decline in Government Infrastructure Spending***

39. As a principle supplier of the construction industry in Argentina, Loma Negra benefitted materially from government spending on public works and infrastructure projects. Indeed, in the Prospectus Loma Negra pointed to infrastructure and public works projects as a key driver of demand for Loma Negra's products:

> Similar to other regional markets, the demand for cement in Argentina is expected to be driven by infrastructure projects as well as residential and non-residential construction activity. In the near term, the announced infrastructure projects coupled with new financing sources for residential construction are expected to drive incremental local cement demand.
>
> Argentina needs substantial investments in infrastructure to improve its competitiveness and foster future economic growth. The Global Competitiveness Report for 2016–2017 reflects the opportunity for improvement in the state of Argentine infrastructure as Argentina ranked 85th among 138 countries under the Infrastructure category.

40. In November 2015, Mauricio Macri led a coalition that won national elections, and promised, among other things, to dedicate substantial resources toward improving Argentina's infrastructure. In September 2016 the Macri administration announced an investment plan totaling US$260 billion, which included the improvement of roads and highways, and the construction of dams and social housing.

41. In its Prospectus, Defendants cited AAICI Ingeniería y Construcción Industrial in stating that it expects investment in transportation infrastructure and public works projects in Argentina to total approximately US$155 billion over the coming ten years.

42. In the Prospectus, and in additional public statements and filings with the SEC throughout 2017 and 2018, Defendants pointed to increased government spending on infrastructure and public works projects as driving increased demand for Loma Negra's products.

43. At least by the time of the IPO, however, it was known within the construction industry that the Argentine government had fallen behind, and in some cases had stopped making payments to government contractors.

44. The Spanish-language newspaper *El Intransigente* reported as follows in a July 3, 2017 article:

> One of the most grandiose announcements made by Mauricio Macri was the reactivation of public works. However, the Argentine Chamber of Construction [Camarco] and the union in the sector, UOCRA, requested a meeting in the Ministry of the Interior because, they say, the payments for housing works are being held back. Officials still deny the issue, while acknowledging that there is a political struggle with the provinces.
>
> ***
>
> According to [Camarco], the Government was making payments of around 2,000 million pesos a month to companies that are building homes throughout the country. "But in May the payments stopped and in June they were only $ 300 million," they say. "If tomorrow

> they tell us that it was only a delay, everything is fine, but we will have to see what to do," the businessmen added.

45. The situation with government payments for infrastructure spending, however, deteriorated in the months after the IPO. For example, on November 24, 2017, the Spanish language newspaper *Perfil* reported that the government owed three major construction companies and Camarco nearly $7 billion (approximately US$200 million) and that payments had slowed considerably since the recent October 2017 elections.

46. In early 2018, the government stated that it had frozen payments for public works that were due in November and December 2017, to avoid increasing the deficit. Later, in June 2018, the government admitted that it had been untimely in making payments to public works contractors.

47. On July 18, 2018, the Spanish language business newspaper *Bae Negocios* reported a significant slowdown in public works projects, where sources indicated that

> The government says that the works are still underway with absolute normality, ***but the reality is different***: the provinces and companies no longer charge 60 days but 120 days in the whole country," said sources in the sector. This situation has caused a weakening of the payment chain due to the fact that the slowdown or slowdown of ongoing projects affects the payment to suppliers.[1] (Emphasis added).

***Defendants' False and Misleading Statements About Government Infrastructure Spending***

48. On July 12, 2017, Loma Negra filed with the SEC a confidential draft registration statement on Form F-1, which, incorporating and in combination with related documents on Form F-6 and filed pursuant to Rule 424(b)(4), would be used for the IPO following a series of amendments in response to SEC comments, including comments from the SEC emphasizing the

[1] Articles published in Spanish have been preliminarily translated into English

importance of adequately disclosing material trends and risk factors, as required by Items 303 and 503.

49. On October 19, 2017, Loma Negra filed its final amendment to the Registration Statement, which registered over 53.5 million Loma Negra ADS for public sale. The SEC declared the Registration Statement effective on November 1, 2017. On November 2, 2017, Defendants priced the IPO at $19 per share and filed the final Prospectus for the IPO. The Registration Statement, Prospectus, and related filings are referred to as the "Offering Documents." Through the IPO, Defendants issued and sold over 53.5 million ADS, all pursuant to the Offering Documents.

50. In the Offering Documents, Defendants represented that Loma Negra would benefit from increased demand for cement and related products, driven by economic growth and increased government spending on infrastructure and public works projects.

51. For example, the Prospectus states as follows:

> We understand that the low cement consumption per capita in Argentina relative to other Latin American economies, the limited number of major infrastructure investments in the country over the last decade, the local housing deficit and the growth prospects for the Argentine economy create a compelling opportunity for the construction sector and will jointly drive demand for cement, masonry cement, concrete, aggregates, lime and other building materials.
>
> ***
>
> In September 2016, the Macri administration announced a US$260.0 billion investment plan across multiple sectors of the economy, including improvement of existing roads and construction of new roads and highways, and the construction of dams and social housing, among other. According to AAICI Ingeniería y Construcción Industrial, investment in transportation infrastructure and public works projects in Argentina are expected to total approximately US$155 billion mainly during the next 10 years. For example, the Argentine government launched a nationwide plan to

> renovate and operate existing roads and highways and to develop new ones for a total of US$55 billion, from 2017 through 2027.

52. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time Defendants filed and distributed the Offering Documents, the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

53. The Prospectus also stated that:

> Similar to other regional markets, the demand for cement in Argentina is expected to be driven by infrastructure projects as well as residential and non-residential construction activity. In the near term, the announced infrastructure projects coupled with new financing sources for residential construction are expected to drive incremental local cement demand.
>
> Argentina needs substantial investments in infrastructure to improve its competitiveness and foster future economic growth. The Global Competitiveness Report for 2016–2017 reflects the opportunity for improvement in the state of Argentine infrastructure as Argentina ranked 85th among 138 countries under the Infrastructure category.
>
> In order to address this concern, in September 2016 the Macri administration announced a US$260 billion investment plan across multiple sectors, including the improvement of roads and highways, the construction of dams and social housing, among others.

54. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time Defendants filed and distributed the Offering Documents , the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

55. Defendants further stated in the Prospectus that:

> As the leading market player, we believe we are the best positioned company to benefit from the increase in cement consumption in Argentina.
>
> ***
>
> We believe that our nationwide presence, production and distribution capabilities, our extensive limestone reserves as well as our recognized brand provide us with a competitive advantage to benefit from the expected growth dynamics in our markets in the near and medium term. We also believe that the relatively low cement consumption per capita in Argentina compared to other countries, the housing deficit, the positive macroeconomic outlook and the announced infrastructure investment plans will translate into growth opportunities in the construction sector driving incremental demand for cement, masonry cement, concrete, lime, aggregates and other building materials.

56. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time Defendants filed and distributed the Offering Documents , the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

57. Defendants also stated in the Prospectus that:

> We intend to take advantage of our differentiated market position in Argentina and further improve our market position to consistently capture the increasing cement demand anticipated as a consequence of the expected recovery of the Argentine economy. In effect, as the leader in the Greater Buenos Aires region, we are participating in most of the major construction and infrastructure public projects that have commenced in 2017 in the Province of Buenos Aires, supplying their respective cement and concrete needs.

58. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time Defendants issued the Prospectus, the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure

and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

59. The Prospectus also discloses certain Risk Factors, including the following:

> ***A reduction in private or public construction projects in Argentina and/or Paraguay could have an adverse effect on our business, financial condition and results of operations.***
>
> Significant interruptions or delays in, or the termination of, private or public construction projects may adversely affect our business, financial condition and results of operations. Private and public construction levels in our market depend on investments in the region which, in turn, are affected by economic conditions.
>
> We cannot assure you that the Argentine and/or Paraguayan governments will execute the infrastructure plans as communicated. A reduction in public infrastructure spending in the markets in which operate or delay in the execution of these projects could have an adverse effect on the general growth of the economy and, therefore, could adversely affect our business, financial condition and results of operations.

60. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time Defendants filed and distributed the Offering Documents, the risk of a reduction in public infrastructure spending had already materialized, in that the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

61. On April 27, 2018, Loma Negra filed its Annual Report on Form 20-F for the fiscal year ending December 31, 2017 (the "2017 20-F").

62. The 2017 20-F does not include reference to the expected US$155 billion in expected infrastructure spending that Defendants discuss in the Prospectus.

63. The 2017 20-F does, however, include a Risk Factor identical to that in the Prospectus. Specifically, Loma Negra discloses in the 2017 20-F that:

> A reduction in private or public construction projects in Argentina and/or Paraguay could have an adverse effect on our business, financial condition and results of operations.
>
> Significant interruptions or delays in, or the termination of, private or public construction projects may adversely affect our business, financial condition and results of operations. Private and public construction levels in our market depend on investments in the region which, in turn, are affected by economic conditions.
>
> We cannot assure you that the Argentine and/or Paraguayan governments will execute the infrastructure plans as communicated. A reduction in public infrastructure spending in the markets in which operate or delay in the execution of these projects could have an adverse effect on the general growth of the economy and, therefore, could adversely affect our business, financial condition and results of operations.

64. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time of the 2017 20-F, the risk of a reduction in public infrastructure spending had already materialized, in that the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

65. The 2017 20-F also states:

> As the leading market player, we believe we are the best positioned company to benefit from the increase in cement consumption in Argentina.
>
> ***
>
> We believe that our nationwide presence, production and distribution capabilities, our extensive limestone reserves as well as our recognized brand provide us with a competitive advantage to benefit from the expected growth dynamics in our markets in the near and medium term. We also believe that the relatively low cement consumption per capita in Argentina compared to other

> countries, the housing deficit, the positive macroeconomic outlook and the announced infrastructure investment plans will translate into growth opportunities in the construction sector driving incremental demand for cement, masonry cement, concrete, lime, aggregates and other building materials.

66. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time of the 2017 20-F, the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

67. The 2017 20-F also states that:

> We intend to take advantage of our differentiated market position in Argentina and further improve our market position to consistently capture the increasing cement demand anticipated as a consequence of the expected recovery of the Argentine economy. In effect, as the leader in the Greater Buenos Aires region, we are participating in most of the major construction and infrastructure public projects that have commenced in 2017 in the Province of Buenos Aires, supplying their respective cement and concrete needs.

68. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time of the 2017 20-F, the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

69. Defendants also knowingly or recklessly omitted from the 2017 20-F's section on "Subsequent Events" any mention of the Argentine government's material cutback in payments to public works contractors, stating, "[t]he Group has evaluated subsequent events as at December 31, 2017 to assess the need for potential recognition or disclosure in these consolidated financial

statements. Such events were assessed until March 8, 2018 the date these consolidated financial statements were available to be issued."

70. The 2017 20-F, however, contains no mention of the Argentine government's failure to make payments to government contractors, and the effect of the government's actions on the expected demand for cement and related products.

71. The statements in the 2017 20-F concerning "Subsequent Events" were materially false and misleading because Defendants were duty bound to disclose, but failed to disclose, that at the time of the 2017 20-F, the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

72. On March 12, 2018, in a conference call with analysts to discuss the Company's 4Q 2017 earnings ("4Q 2017 Earnings Call"), Defendant Faifman stated, "[o]ur growth in the quarter and the full year was supported by broad-based economic expansion in Argentina. The construction sector was one of the major beneficiaries of the economic expansion driven by public infrastructure works and private construction. This, in turn, drove robust demand for cement and concrete."

73. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time of the statements, the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

74. Faifman continued during the 4Q 2017 Earnings Call, stating:

> In Argentina, our largest market, we expect overall industry cement demand to continue expanding in the coming years, driven by public

> infrastructure works and private construction, further supporting our expansion plans. Through our strong market position, efficient nationwide distribution, and top of mind brand we are well positioned to continue to maximize the attractive growth opportunity in our markets. Importantly, our facility located in the key geographic centers with the highest growth potential will also allow us to further benefit from the anticipated growth in infrastructure projects.

75. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time of the statements, the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

76. Also during the 4Q 2017 Earnings Call, Defendant Gradin stated as follows:

> Construction activity posted a strong recovery last year, leading growth in 2017 – up almost 13% in the year - mainly driven by public sector expenditure in infrastructure and improved economic activity. This has resulted in robust growth in cement sales, recovering to record levels of 2015. Looking ahead, we see two key factors driving cement demand: First, continued overall economic recovery and the expansion of the mortgage market that is anticipated to boost household consumption of cement; and second, the ongoing execution of the public infrastructure plan, along with other private investments. The strong pick-up in the public infrastructure resulted in record levels in industry bulk cement dispatches, together with a robust expansion of our Concrete volumes.

77. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time of the statements, the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

78. Also during the 4Q 2017 Earnings Call, in response to a question from Eduardo Altamirano of HSBC concerning infrastructure and road construction, Defendant Faifman stated that "in Argentina the aggregate business is also increasing. It's growing, particularly in the Buenos Aires area, due to the public works project infrastructure and construction."

79. The foregoing was materially false and misleading because Defendants knew or were reckless in not knowing that at the time of the statements, the Argentine government was running fiscal deficits that prevented it from funding the expected infrastructure and public works projects, and in fact had already delayed and or stopped making payments to government contractors.

***The Truth about Infrastructure Spending Emerges***

80. On May 13, 2018, analysts from UBS AG ("UBS") issued a research note (the "UBS Note") in which they double-downgraded Loma Negra's ADS to "sell" (from "buy") and dropped the twelve-month price target from $26.50 to $14.50. Prominent in UBS's decision to downgrade the ADS on expected softening of cement demand, in light of cuts in public spending by the Argentine government amounting to $30 billion.

81. In response to this news, the price of Loma Negra ADS fell from a closing price of $16.90 on May 11, 2018 (the last trading day before the issuance of the UBS Note) to $14.15 on May 14, 2018 (the first trading day after the issuance of the UBS Note), a drop of 16.2%.

82. As a direct and proximate result of Defendants' materially false and misleading statements, Plaintiffs and other Class members have suffered significant losses and damages.

***Loma Negra's Anticompetitive Practices***

83. Loma Negra has several principal competitors in the Argentinian cement market, though given the high costs of entry and operation, competition is limited. As the Company stated in its 2017 Annual Report:

> Following the consolidation of the cement industry in Argentina during the 1990s, LafargeHolcim, an international cement company, through its acquisition of Juan Minetti S.A. and Corcemar S.A., two Argentine cement producers, became the second largest cement producer in Argentina. Other Argentine cement producers include Cementos Avellaneda S.A., or Avellaneda, a company controlled by Cementos Molins, S.A. and Votorantim Cimentos S.A., and Petroquímica Comodoro Rivadavia S.A., or PCR. Given the high cost of transporting cement, our competitors are generally limited in competing in the regions where their production facilities are located. We are the only cement company in Argentina with production facilities located in several regions of Argentine and with nationwide reach.

84. Loma Negra, however, has a history of anticompetitive behavior, which has drawn the attention of Argentinian authorities.

85. For example, Argentinian authorities determined that Loma Negra had committed extensive violations of Argentinian antitrust regulations between 1981 and 1999, by colluding with competitors to fix prices and distribute market share. The Argentinian National Commission for the Defense of Competition (CNDC) imposed fines against Loma Negra for these violations.

86. Further, the CNDC found in 2017 that Loma Negra had abused its dominant market position to artificially increase prices. According to the Company, this CNDC investigation is ongoing.

***Defendants' False and Misleading Statements***
***Concerning Loma Negra's Anticompetitive Practices***

87. The Prospectus described various antitrust proceedings to which regulators had subjected Loma Negra:

CNDC Fine. In 1999, the Argentine Antitrust Commission, or the CNDC, initiated administrative investigations against the largest Argentine cement companies, including Loma Negra, for alleged violations of Argentine antitrust regulations by means of an alleged mutual agreement among all companies to fix prices and to distribute the market share among themselves during the period from 1981 to 1999, causing a potential damage to the general economic interest. On July 25, 2005, the CNDC determined that Loma Negra and Cementos San Martín (a company acquired by, and merged into, Loma Negra in 1992), together with other cement companies, violated these regulations and imposed a fine against Loma Negra in the aggregate amount of Ps.167.2 million. This resolution by the CNDC was appealed and finally confirmed in 2013 by the Argentine National Supreme Court of Justice, and Loma Negra paid the fine.

CNDC Market Investigation (C. 1476). In 2013, the CNDC initiated administrative investigations related to the price of cement. To this end, the CNDC requested information from all cement companies involved in the 1999 investigation. In June 2014, the CNDC removed Loma Negra as a party to the investigative proceeding and confirmed that it is a market investigation where the cement companies do not have access to the file. As of the date of this prospectus, the case is under analysis by the CNDC.

CNDC Market Investigation (C. 1491). In 2014, the CNDC initiated a market investigation that involved all construction materials companies. However, no particular company has been charged or is subject to investigation for anti-competitive behavior. In March and June 2014, Loma Negra submitted all the information requested by the Antitrust Commission. As of the date of this prospectus, the case is under analysis by the CNDC.

CNDC Investigation—Abuse of Dominant Position (C. 1488). In 2014 the Association of Small- and Micro- Enterprises (Asociación de Pequeñas y Micro Empresas) filed a claim against cement, steel and aluminum companies (including Loma Negra) for alleged abuse of dominant market position and artificial increases in product prices. In March 2016, Loma Negra filed an answer against the complaint and denied all claims, which was rejected by the CNDC on August 25, 2017. We plan to file a motion for reconsideration against this administrative decision. If the CNDC decision becomes final, the CNDC will move forward with its investigation, which might result in a judicial accusation against steel and aluminum companies (including Loma Negra) of breaches of antitrust laws.

> CNDC Investigation—Competitive Conditions in Cement Market. On August 10, 2017, we were notified of a new administrative investigation initiated by the CNDC regarding competitive conditions in the cement market in Argentina. The CNDC has requested us to file several information and documentation related to products that we commercialized. As of the date of this prospectus, the case is under analysis by the CNDC.

88. The foregoing statements concerning CNDC investigations of anti-competitive behavior by Loma Negra were false and/or misleading because Defendants knew or recklessly disregarded that Loma Negra had continued to engage in price fixing and other anticompetitive behavior, and that this conduct would subject Loma Negra to heightened scrutiny from the CNDC and other Argentinian authorities, and regulatory action.

89. The 2017 20-F, filed with the SEC on April 27, 2018, also described the various antitrust proceedings to which Loma Negra had been a party:

> CNDC Fine. In 1999, the Argentine Antitrust Commission, or the CNDC, initiated administrative investigations against the largest Argentine cement companies, including Loma Negra, for alleged violations of Argentine antitrust regulations by means of an alleged mutual agreement among all companies to fix prices and to distribute the market share among themselves during the period from 1981 to 1999, causing a potential damage to the general economic interest. On July 25, 2005, the CNDC determined that Loma Negra and Cementos San Martín (a company acquired by, and merged into, Loma Negra in 1992), together with other cement companies, violated these regulations and imposed a fine against Loma Negra in the aggregate amount of Ps.167.2 million. This resolution by the CNDC was appealed and finally confirmed in 2013 by the Argentine National Supreme Court of Justice, and Loma Negra paid the fine.
>
> CNDC Market Investigation (C. 1476). In 2013, the CNDC initiated administrative investigations related to the price of cement. To this end, the CNDC requested information from all cement companies involved in the 1999 investigation. In June 2014, the CNDC removed Loma Negra as a party to the investigative proceeding and confirmed that it is a market investigation where the cement companies do not have access to the file. As of the date of this annual report, the case is under analysis by the CNDC.

> CNDC Market Investigation (C. 1491). In 2014, the CNDC initiated a market investigation that involved all construction materials companies. However, no particular company has been charged or is subject to investigation for anti-competitive behavior. In March and June 2014, Loma Negra submitted all the information requested by the Antitrust Commission. As of the date of this annual report, the case is under analysis by the CNDC.
>
> CNDC Investigation—Abuse of Dominant Position (C. 1488). In 2014 the Association of Small- and Micro- Enterprises (Asociación de Pequeñas y Micro Empresas) filed a claim against cement, steel and aluminum companies (including Loma Negra) for alleged abuse of dominant market position and artificial increases in product prices. In March 2016, Loma Negra filed an answer against the complaint and denied all claims, which was rejected by the CNDC on August 25, 2017. On September 8, 2017, we filed a motion for reconsideration against this administrative decision. As of the date of this report, such motion is being analyzed by the CNDC. If the CNDC decision becomes final, the CNDC will move forward with its investigation, which might result in a judicial accusation against steel and aluminum companies (including Loma Negra) of breaches of antitrust laws.
>
> CNDC Investigation—Competitive Conditions in Cement Market. On August 10, 2017, we were notified of a new administrative investigation initiated by the CNDC regarding competitive conditions in the cement market in Argentina. The CNDC has requested us to file several information and documentation related to products that we commercialized. As of the date of this annual report, the case is under analysis by the CNDC.

90. The foregoing statements concerning CNDC investigations of anti-competitive behavior by Loma Negra were false and/or misleading because Defendants knew or recklessly disregarded that Loma Negra had continued to engage in price fixing and other anticompetitive behavior, and that this conduct would subject Loma Negra to heightened scrutiny from the CNDC and other Argentinian authorities, and regulatory action.

***The Truth about Loma Negra's Anticompetitive Practices Emerges***

91. On May 23, 2018, La Nación reported that the Argentinian National Commission for the Defense of Competition (CNDC) had accelerated an "investigation against the cement companies for alleged collusion and alleged oligopolistic behavior." Loma Negra, as the industry leader in Argentina, is mentioned as a company from whom the government requested information.

92. In response, Loma Negra shares declined $2.19, or 11%, to close at $12.99 on May 23, 2018, on unusually heavy volume. The price of Loma Negra shares continued to fall on May 24, closing at $11.56 on May 24, 2018, a total drop of nearly 24% between May 22 and May 24.

93. Also on May 23, 2018, financial analysts from Morgan Stanley issued a research note (the "Morgan Stanley Note"), removing their rating and price target for Loma's stock in the wake of the announcement of the price-fixing investigation.

94. The Morgan Stanley Note stressed the potential economic impact of the investigation on Loma Negra, as follows:

> With regard to any potential fine, amendments to the antitrust law were approved on May 9, 2018. This law now dictates that companies judged to be involved in monopolistic or cartel practices in the country will be subject to a fine of up to 30% of volumes associated with the business related to any conduct determined to be illegal (with a retroactive effect). That is, the fine would be multiplied by the years in which illegal practices are judged to have been carried out. The amount cannot exceed 30% of volumes of the consolidated company. Thus, the Company's statements in the Registration Statement, taken individually and collectively, were materially false and misleading because they failed to disclose and misrepresented adverse facts that existed at the time of the IPO.
>
> Potential bad news for Loma Negra if the CNDC eventually determines it violated the antitrust law. This becomes critical for the structural story and for our thesis of investment-led growth for Loma Negra as it could cap the upside. Particularly for our two-phased thesis that states that the cement industry in Argentina could enter into a recovery phase driven by prices, at first. We are moving our

> rating to Not-Rated, our PT to NA, and removing our estimates until we get more information on the situation.

95. On May 29, 2018, Loma Negra hosted a call with investors to address the media reports of the government investigation. On this call, Defendant Faifman stated, through an nterpreter, "We are not aware of the existence of any type of proceeding, investigation, trial, or similar action against the company by the Comision Nacional de Defensa de la Competencia (CNDC) or any other another body alleging cartelization in the cement industry."

***The Offering Documents Fail Accurately to Disclose Corruption Allegations Impacting the Company***

96. Loma Negra's parent company at the time of the IPO, InterCement, is also a holding company for the cement business of the Camargo Corrêa group. The Camarga Corrêa group also controls a construction and engineering affiliate of InterCement known as Construções e Comércio Camargo Corrêa S.A. ("CCCC").

97. CCCC was implicated by Brazilian authorities for its involvement in bribery and other instances of corruption in connection with the Operation Car Wash investigation.

98. Operation Car Wash (Operação Lava Jato) is an ongoing corruption investigation by Brazilian authorities that has centered on allegations of corruption at Petróleo Brasileiro S.A. ("Petrobras"), which included money laundering, bribing of Petrobras executives in return for awarding contracts to construction firms, and kickbacks to politicians.

99. The investigation led, among other things, to the impeachment of Brazilian president Dilma Rousseff, and the imprisonment of former president Luiz Inácio Lula da Silva.

100. The Offering Documents downplayed and misrepresented the extent of Loma Negra's exposure to the Operation Car Wash scandal. In the Prospectus, Defendants stated the following:

CCCC and certain of its former senior management and employees have recently been the subjects of a Brazilian Federal Police investigation referred to as Operation Car Wash, which is an investigation into widespread allegations of corruption, including at the Brazilian federal government controlled national oil company Petróleo Brasileiro S.A.—Petrobras, where certain of its employees accepted bribes from a number of construction companies, including CCCC.

In connection with the Operation Car Wash investigation and comprehensive internal investigations undertaken by CCCC with the assistance of external experts, CCCC and certain of its former senior management and employees entered into leniency and plea bargain agreements with the Brazilian authorities pursuant to which they admitted to violations of Brazilian antitrust and anti-corruption laws and agreed to pay compensation totaling more than 800 million Brazilian reals , which included fines and other indemnification, and committed to continue to cooperate with Brazilian authorities. In addition, CCCC continues to conduct internal investigations on an ongoing basis regarding its anti-corruption compliance.

The news of Operation Car Wash also had repercussions in other Latin America countries where CCCC operates besides Brazil, including Peru, Argentina and Venezuela. According to certain media reports, government investigations are underway in those countries for alleged acts of corruption involving Brazilian construction companies. ***CCCC's management has conducted internal investigations with the help of external experts and to-date has not identified evidence of any wrongdoing performed by CCCC in these countries***.

Any additional violations of anti-corruption and/or antitrust laws involving CCCC may result in additional fines and/or indemnification obligations. ***In addition, any additional adverse events or developments could have a material adverse impact on CCCC and the Camargo Corrêa group, which may subject us to reputational damage and could materially adversely affect the trading price of our ordinary shares and ADSs. Moreover, although we have been informed by CCSA and its counsels that CCCC should be solely liable for any violations by CCCC of antitrust and/or anti-corruption laws, no assurances can be given that affiliates of CCCC will not also be found to be liable for any such violations of law***. (Emphasis added).

101. The foregoing statements were materially false and misleading because they failed to disclose that CCCC's involvement in a scheme to bribe members of the Kirchner administration to procure the contract for a major public works project in Argentina; further, far from "no evidence of any wrongdoing" by CCCC in Argentina, authorities had extensive evidence of Camargo Corrêa and CCCC's participation in a bribery and kickback scheme to obtain public works contracts in Argentina.

102. In fact, in addition to its corrupt and illegal activities in Brazil uncovered by the Operation Car Wash investigation, CCCC and Camargo Corrêa had been implicated in an extensive bribery scheme in Argentina, related to public works projects during the Kirchner administration.

103. In early 2008, Argentina's state-run water and sanitation company, Agua y Saneamientos Argentinos ("AySA") announced that it would be accepting bids for the construction of the "Bicentenario" water treatment plant in Berazategui, in Buenos Aires province.

104. To secure the bid for the Bicentenario, Camargo Corrêa formed a joint partnership with Esuco S.A., an Argentinian construction firm headed by Carlos Wagner, a close associate of then-Argentine president Nestor Kirchner.

105. Wagner, in addition to being head of Esuco, was also the head of the Argentina Chamber of Commerce for Construction ("Camarco").

106. Throughout 2017 and 2018, in response to the revelations of Operation Car Wash, Argentine authorities conducted investigations of public works projects in Argentina, including the Bicentenario.

107. On June 21, 2017, the Argentine Prosecutor's Office sought an inquest in the Argentine courts of numerous individuals, including Wagner, and Camargo Corrêa executives

Jaime José Juraszek Junior and Sergio Gabriel Chividini (signatories to the Bicentenario project contract), along with several other executives in the construction industry.

108. These investigations revealed numerous instances of Camargo Corrêa and CCCC representatives paying bribes to Argentine government officials in connection with the Bicentenario project.

109. In August 2018, press reports in Argentina revealed the "Notebook Scandal", which concerns a number of spiral notebooks maintained by a driver for an Argentine public works official that detail extensive bribery payments (approximately $160 million) in connection with the procurement of government contracts, including those related to the Bicentenario.

110. In addition, in 2018 Argentine officials revived a dormant Brazilian investigation known as "Operation Sand Castle" (Operação Castelo de Areia), which Brazilian authorities had commenced in 2009 and focused on Camargo Corrêa. During the Operation Sand Castle investigation, Brazilian authorities found a pen drive and notebook belonging to Pedro Giavina Bianchi, a CCCC executive, which detailed CCCC's bribes to government officials, including in Argentina. The public first learned of these details when a collective of South American journalists published the information regarding Operation Sand Castle in September 2018.

## CLASS ACTION ALLEGATIONS

111. Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action as a class action on behalf of all those who purchased Loma Negra ADSs (1) pursuant or traceable to the Offering Documents issued in connection with the Company's IPO on or about November 2, 2017, seeking to pursue remedies under the Securities Act; and/or (2) on the open market between November 2, 2017 and May 23, 2018, inclusive, seeking to pursue remedies under the Exchange Act; and who were damaged thereby (collectively, "Class"). Excluded from the Class are Defendants and their

families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

112. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Loma Negra or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

113. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

114. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the Securities Act;

b. whether Defendants violated the Exchange Act;

c. whether statements made by Defendants to the investing public in the Offering Documents were false and/or misrepresented material facts about the business and operations of Loma Negra;

d. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business operations, and management of Loma Negra;

e. whether Defendants acted knowingly or recklessly in making false and misleading statements during the Class Period;

f. to what extent the members of the Class have sustained damages and the proper measure of damages.

115. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

116. With respect to their Rule 10b-5 claim, Plaintiffs will rely on the presumption of reliance established by the fraud on the market doctrine. At all relevant times, the market for Loma Negra's ADS was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Loma Negra's ADS traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's ADS relying upon the integrity of the market price of Loma Negra's ADS and market information relating to Loma Negra, and have been damaged thereby.

117. During the Class Period, the artificial inflation of the price of Loma Negra's ADS was caused by the material misrepresentations and/or omissions particularized in this Amended

Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Loma Negra's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Loma Negra and its business, operations, and prospects, thus causing the price of the Company's ADS to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company ADS. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's ADS at such artificially inflated prices, and each of them has been damaged as a result.

118. At all relevant times, the market for Loma Negra's ADS was an efficient market for the following reasons, among others:

a. Loma Negra's ADS met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, Loma Negra filed periodic public reports with the SEC and/or the NYSE;

c. Loma Negra regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. Loma Negra was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales

force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

119. As a result of the foregoing, the market for Loma Negra's ADS promptly digested current information regarding Loma Negra from all publicly available sources and reflected such information in the price of Loma Negra's ADS. Under these circumstances, all purchasers of Loma Negra's ADS during the Class Period suffered similar injury through their purchase of Loma Negra's ADS at artificially inflated prices and a presumption of reliance applies.

120. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**FIRST CAUSE OF ACTION**
**For Violation of § 11 of the Securities Act**
**Against All Defendants**

121. Plaintiffs incorporate all the foregoing paragraphs in their entirety by reference herein.

122. This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

123. The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

124. Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

125. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

126. By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated § 11 of the Securities Act.

127. Plaintiffs acquired Loma Negra ADS pursuant to the Registration Statement.

128. Plaintiffs and the Class have sustained damages. The value of Loma Negra ADS has declined substantially subsequent to and due to Defendants' violations.

129. At the time of their purchases of Loma Negra shares, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action. Less than three years had elapsed between the time that the securities upon which this Cause of Action is based were offered to the public and the time Plaintiff Carmona commenced this action.

**SECOND CAUSE OF ACTION**
**For Violation of § 12(a)(2) of the Securities Act**
**Against All Defendants**

130. Plaintiffs incorporate all the foregoing paragraphs in their entirety by reference herein.

131. By means of the defective Prospectus, Defendants promoted, solicited, and sold Loma Negra shares to Plaintiffs and other members of the Class.

132. The prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiffs and the other members of the Class who purchased Loma Negra shares pursuant to the prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus as set forth above.

133. Plaintiffs did not know, nor in the exercise of reasonable diligence could Plaintiffs have known, of the untruths and omissions contained in the prospectus at the time Plaintiffs acquired Loma Negra shares.

134. By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased Loma Negra shares pursuant to the prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiffs and the other members of the Class who hold the ADS issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their ADS to Defendants

sued herein. Class members who have sold their ADS seek damages to the extent permitted by law.

**THIRD CAUSE OF ACTION**
**For Violation of § 15 of the Securities Act**
**Against The Individual Defendants and the Selling Shareholder**

135. Plaintiffs incorporate all the foregoing paragraphs in their entirety by reference herein.

136. This Cause of Action is brought pursuant to § 15 of the Securities Act against all Defendants.

137. The Individual Defendants were controlling persons of Loma Negra by virtue of their positions as directors or senior officers of Loma Negra. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of Loma Negra. The Selling Shareholder controlled the Company. The Company controlled the Individual Defendants and all of Loma Negra's employees.

138. Loma Negra, the Selling Shareholder, and the Individual Defendants were culpable participants in the violations of §§ 11 and 12(a)(2) of the Securities Act alleged in the First and Second Causes of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

**FOURTH CAUSE OF ACTION**
**For Violation of § 10(b) of the Exchange Act and SEC Rule 10b-5**
**Against Defendants Loma Negra Compañía Industrial**
**Argentina Sociedad Anónima, Faifman, and Gradin**

139. Plaintiffs incorporate paragraphs 1-95 and 111-120 in their entirety by reference herein.

140. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Loma Negra's ADS at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

141. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Omega's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

142. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Loma Negra's financial well-being and prospects, as specified herein.

143. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of Loma Negra's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Loma Negra and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

144. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

145. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Loma Negra's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

146. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Loma Negra's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Loma Negra's securities during the Class Period at artificially high prices and were damaged thereby.

147. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Omega was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Loma Negra

securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

148. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**FIFTH CAUSE OF ACTION**
**For Violation of § 20(a) of the Exchange Act**
**Against Defendants Faifman and Gradin**

149. Plaintiffs incorporate paragraphs 1-95, 111-120, and 139-148 in their entirety by reference herein.

150. Individual Defendants acted as controlling persons of Loma Negra within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

151. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the

particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

152. As set forth above, Loma Negra and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury.

Dated: April 26, 2019

**THE ROSEN LAW FIRM, P.A.**

/s/ *Phillip Kim*
Phillip Kim
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg
David P. Dean
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ddean@rosenlegal.com

***Lead Counsel for Plaintiffs and the Putative Class***

**CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2019, I electronically filed the foregoing ***Amended Class Action Complaint for Violation of the Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
E-M: jgoldberg@rosenlegal.com

***Lead Counsel for Lead Plaintiffs and the Class***