UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
SANDOR KAROLYI and EUGENIO CARMONA,
Individually and on Behalf of All
Others Similarly Situated,

            Plaintiffs,          18 Civ. 11323 (LLS)

       - against -           OPINION & ORDER

LOMA NEGRA COMPANIA INDUSTRIAL ARGENTINA
SOCIEDAD ANONIMA, LOMA NEGRA HOLDING
GmbH, SERGIO FEIFMAN, MARCOS ISABELINO
GRADIN, RICARDO FONSECA DE MENDOCA LIMA,
LUIZ AUGUSTO KLECZ, PAULO SERGIO DE
OLIVEIRA DINIZ, CARLOS BOERO HUGHES,
DIANA MONDINO, and SERGIO DANIEL ALONSO,

         Defendants.
- - - - - - - - - - - - - - - - - - - - X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED:  4/27/20             │
└─────────────────────────────────┘
```

     In this putative securities class action, defendants Loma

Negra Compania Industrial Argentina Sociedad Anonima ("Loma

Negra") and Loma Negra Holding GmbH (now named Caue Austria

Holding GmbH) (together, the "corporate defendants") move

pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6)

and the Private Securities Litigation Reform Act of 1996

("PSLRA"), 15 U.S.C. § 78u-4, to dismiss lead plaintiff Sandor

Karolyi and named plaintiff Eugenio Carmona's amended complaint.

     For the following reasons, the motion (Dkt. No. 48) is

granted.

## BACKGROUND

     Lead plaintiff Sandor Karolyi and named plaintiff Eugenio

Carmona sue the corporate defendants and eight of their officers

on behalf of purchasers of Loma Negra American Depository Shares
("ADSs"), alleging that defendants' false or misleading
statements artificially inflated the ADS price and induced
plaintiffs to purchase ADSs, and that when those statements were
disclosed as false or misleading caused the ADS price to drop
and plaintiffs to suffer economic losses. Mr. Karolyi purchased
ADSs on May 14, 2018, and Mr. Carmona purchased ADSs on January
11, 2018. Their claims are made under Sections 11, 12, and 15 of
the Securities Act, 15 U.S.C. §§ 77k, 77l, 77o, with regard to
offering documents issued by Loma Negra in connection with its
November 2017 initial public offering ("IPO"), and under Section
10(b) of the Exchange Act, 15 U.S.C. § 78j, and SEC Rule 10b-5,
17 C.F.R. § 240.10b-5, on behalf of purchasers of ADSs on the
open market between November 2, 2017, and May 23, 2018.

Plaintiffs claim three series of omissions:

- Loma Negra's failure to disclose that the Argentine
  government had already delayed or stopped making payments
  to government contractors for infrastructure projects in
  its prospectus,[1] 2017 fourth quarter earnings call, and
  2017 annual report (also referred to as "Form 20-F"),[2]
  each discussing Loma Negra's expected benefit from
  increased government infrastructure spending without

---

[1] The prospectus is Exhibit 1 to the Baumstein Declaration.
[2] The 2017 annual report is Exhibit 2 to the Baumstein Declaration.

describing what might happen if that spending abated (the "public spending omissions");

- Loma Negra's failure to disclose its continued anticompetitive practices in its prospectus and 2017 annual report, although the Argentinian government previously found that Loma Negra engaged in price fixing in coordination with other large Argentinian cement and construction supply companies (the "antitrust omissions"); and

- Loma Negra's failure to disclose that its parent the Camargo Corrêa group and its affiliate Construções e Comércio Camargo Corrêa S.A. ("CCCC") were involved in a scheme to bribe Argentine public officials to procure public works contracts (the "bribery omissions").

## DISCUSSION

### I. Section 10(b) / Rule 10b-5 Claims

#### A. Public Spending Omissions

To state a claim under Section 10 of the Exchange Act and SEC Rule 10b-5, a plaintiff must adequately allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and

(6) loss causation." Stoneridge Inv. Partners, LLC v.

Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).

    The Amended Complaint claims that the following statements

made by Loma Negra in its November 2, 2017 prospectus were

knowingly false and misleading because of material omissions:

> We understand that the low cement consumption per
> capita in Argentina relative to other Latin American
> economies, the limited number of major infrastructure
> investments in the country over the last decade, the
> local housing deficit and the growth prospects for the
> Argentine economy create a compelling opportunity for
> the construction sector and will jointly drive demand
> for cement, masonry cement, concrete, aggregates, lime
> and other building materials.
>
> * * *
>
> In September 2016, the Macri administration announced
> a US$260.0 billion investment plan across multiple
> sectors of the economy, including improvement of
> existing roads and construction of new roads and
> highways, and the construction of dams and social
> housing, among other. According to AAICI Ingeniería y
> Construcción Industrial, investment in transportation
> infrastructure and public works projects in Argentina
> are expected to total approximately US$155 billion
> mainly during the next 10 years. For example, the
> Argentine government launched a nationwide plan to
> renovate and operate existing roads and highways and
> to develop new ones for a total of US$55 billion, from
> 2017 through 2027.

Am. Compl. ¶ 51.

> Similar to other regional markets, the demand for
> cement in Argentina is expected to be driven by
> infrastructure projects as well as residential and
> non-residential construction activity. In the near
> term, the announced infrastructure projects coupled
> with new financing sources for residential
> construction are expected to drive incremental local
> cement demand.

>Argentina needs substantial investments in infrastructure to improve its competitiveness and foster future economic growth. The Global Competitiveness Report for 2016-2017 reflects the opportunity for improvement in the state of Argentine infrastructure as Argentina ranked 85th among 138 countries under the Infrastructure category.
>
>In order to address this concern, in September 2016 the Macri administration announced a US$260 billion investment plan across multiple sectors, including the improvement of roads and highways, the construction of dams and social housing, among others.

Id. ¶ 53.

>As the leading market player, we believe we are the best positioned company to benefit from the increase in cement consumption in Argentina.
>
>                      ***
>
>We believe that our nationwide presence, production and distribution capabilities, our extensive limestone reserves as well as our recognized brand provide us with a competitive advantage to benefit from the expected growth dynamics in our markets in the near and medium term. We also believe that the relatively low cement consumption per capita in Argentina compared to other countries, the housing deficit, the positive macroeconomic outlook and the announced infrastructure investment plans will translate into growth opportunities in the construction sector driving incremental demand for cement, masonry cement, concrete, lime, aggregates and other building materials.

Id. ¶ 55.

>We intend to take advantage of our differentiated market position in Argentina and further improve our market position to consistently capture the increasing cement demand anticipated as a consequence of the expected recovery of the Argentine economy. In effect, as the leader in the Greater Buenos Aires region, we are participating in most of the major construction and infrastructure public projects that have commenced

> in 2017 in the Province of Buenos Aires, supplying
> their respective cement and concrete needs.

Id. ¶ 57.

> A reduction in private or public construction projects
> in Argentina and/or Paraguay could have an adverse
> effect on our business, financial condition and
> results of operations.
>
> Significant interruptions or delays in, or the
> termination of, private or public construction
> projects may adversely affect our business, financial
> condition and results of operations. Private and
> public construction levels in our market depend on
> investments in the region which, in turn, are affected
> by economic conditions.
>
> We cannot assure you that the Argentine and/or
> Paraguayan governments will execute the infrastructure
> plans as communicated. A reduction in public
> infrastructure spending in the markets in which
> operate or delay in the execution of these projects
> could have an adverse effect on the general growth of
> the economy and, therefore, could adversely affect our
> business, financial condition and results of
> operations.

Id. ¶ 59.

The Amended Complaint then claims that statements made by

Loma Negra on April 27, 2018 in its 2017 annual report, quoted

in paragraphs 63, 65, and 67 of the Amended Complaint and

identical to the statements from the prospectus quoted above

from paragraphs 59, 55, and 57 of the Amended Complaint, were

knowingly false and misleading because of material omissions.

It also claims that

> 69.    Defendants also knowingly or recklessly
> omitted from the 2017 20-F's section on "Subsequent
> Events" any mention of the Argentine government's
> material cutback in payments to public works

contractors, stating, "[t]he Group has evaluated
subsequent events as at December 31, 2017 to assess
the need for potential recognition or disclosure in
these consolidated financial statements. Such events
were assessed until March 8, 2018 the date these
consolidated financial statements were available to be
issued."

70. The 2017 20-F, however, contains no mention
of the Argentine government's failure to make payments
to government contractors, and the effect of the
government's actions on the expected demand for cement
and related products.

The Amended Complaint then claims that the following

statements made by Loma Negra's CEO Sergio Faifman and CFO

Marcos Isabelino Gradin on March 12, 2018, during Loma Negra's

2017 fourth quarter earnings call, were knowingly false and

misleading by way of material omissions:

"[o]ur growth in the quarter and the full year was

supported by broad-based economic expansion in Argentina. The

construction sector was one of the major beneficiaries of the

economic expansion driven by public infrastructure works and

private construction. This, in turn, drove robust demand for

cement and concrete." Id. ¶ 72 (alteration in original).

In Argentina, our largest market, we expect overall
industry cement demand to continue expanding in the
coming years, driven by public infrastructure works
and private construction, further supporting our
expansion plans. Through our strong market position,
efficient nationwide distribution, and top of mind
brand we are well positioned to continue to maximize
the attractive growth opportunity in our markets.
Importantly, our facility located in the key
geographic centers with the highest growth potential
will also allow us to further benefit from the
anticipated growth in infrastructure projects.

Id. ¶ 74.

> Construction activity posted a strong recovery
> last year, leading growth in 2017 - up almost 13%
> in the year - mainly driven by public sector
> expenditure in infrastructure and improved
> economic activity. This has resulted in robust
> growth in cement sales, recovering to record
> levels of 2015. Looking ahead, we see two key
> factors driving cement demand: First, continued
> overall economic recovery and the expansion of
> the mortgage market that is anticipated to boost
> household consumption of cement; and second, the
> ongoing execution of the public infrastructure
> plan, along with other private investments. The
> strong pick-up in the public infrastructure
> resulted in record levels in industry bulk cement
> dispatches, together with a robust expansion of
> our Concrete volumes.

Id. ¶ 76.

> Also during the 4Q 2017 Earnings Call, in
> response to a question from Eduardo Altamirano of
> HSBC concerning infrastructure and road
> construction, Defendant Faifman stated that "in
> Argentina the aggregate business is also
> increasing. It's growing, particularly in the
> Buenos Aires area, due to the public works
> project infrastructure and construction."

Id. ¶ 78.

> Plaintiffs challenge each of the above-quoted

statements by claiming that

> The foregoing was materially false and misleading
> because Defendants knew or were reckless in not
> knowing that at the time Defendants filed and
> distributed the Offering Documents, the risk of a
> reduction in public infrastructure spending had
> already materialized, in that the Argentine government
> was running fiscal deficits that prevented it from
> funding the expected infrastructure and public works
> projects, and in fact had already delayed and or
> stopped making payments to government contractors.

Am. Compl. ¶ 60; see also ¶¶ 52, 54, 56, 58 (about the
prospectus), 64, 66, 68, 71 (about the 2017 annual report), 73,
75, 77, 79 (about the 2017 quarter four earnings call).

**Knowledge of Decreased Public Spending**

Plaintiffs' claims depend on the assumption that at the
time of each challenged statement, Loma Negra knew more than it
revealed about the Argentine government's infrastructure
spending. Plaintiffs base their allegation of private knowledge
on three factual sources: the fact that "just before the IPO, as
of June 2017, Loma Negra accounted for 45.4% of all cement sales
volume in Argentina," Am. Compl. ¶ 24, and two newspaper
articles that the Amended Complaint cites as follows:

> 44.   The Spanish-language newspaper El Intransigente
> reported as follows in a July 3, 2017 article:
>
>> One of the most grandiose announcements made
>> by Mauricio Macri was the reactivation of
>> public works. However, the Argentine Chamber
>> of Construction [Camarco] and the union in
>> the sector, UOCRA, requested a meeting in
>> the Ministry of the Interior because, they
>> say, the payments for housing works are
>> being held back. Officials still deny the
>> issue, while acknowledging that there is a
>> political struggle with the provinces.
>>
>> ***
>>
>> According to [Camarco], the Government was
>> making payments of around 2,000 million
>> pesos a month to companies that are building
>> homes throughout the country. "But in May
>> the payments stopped and in June they were
>> only $ 300 million," they say. "If tomorrow
>> they tell us that it was only a delay,

> everything is fine, but we will have to see
> what to do," the businessmen added.
>
> 45.   The situation with government payments for
> infrastructure spending, however, deteriorated in the
> months after the IPO. For example, on November 24,
> 2017, the Spanish language newspaper Perfil reported
> that the government owed three major construction
> companies and Camarco nearly $7 billion (approximately
> US$200 million) and that payments had slowed
> considerably since the recent October 2017 elections.

(alterations in original).

As the newspaper articles were released publicly and
informed every interested businessman and reader about the
Argentine government delaying payments to its infrastructure
contractors, those incidents form no basis for an inference that
Loma Negra was withholding inside knowledge on the subject. Nor
do they amount to what plaintiffs characterize as a "trend" of
non-payment. The first incident was in early July and seems to
have been resolved: there is no media follow-up. Loma Negra
issued its prospectus on November 2, 2017, and three weeks later
the November 24, 2017 Perfil article was published.

But the demand for cement (90% of the company's sales)
finished with a 12% increase in 2017 volume. The UBS Report on
Loma Negra, issued May 13, 2018, referred to Loma Negra's
"strong 1st quarter 2018 showing" which continued in April and
May (industry volumes were up 23% in March 2018) with UBS's
"Buy" rating until the government announced that to lower its
fiscal deficit it will greatly reduce infrastructure spending

(pp. 2, 4) and "hiked interest rates by 12.75 pp in less than two weeks, effectively increasing Loma Negra's financial costs." Id. at 16. Following that Report,[3] with its news of what the government had "just announced," and the change in UBS's recommendation to "Sell," the price of Loma Negra shares fell, plaintiffs complain, by almost 24%. Pls.' Opp'n Mem. 6.

Rather than supporting a supposition, without a shred of evidence, that when the prospectus was issued Loma Negra knew from non-public information that its expectations were misleading, this shows the inherent risk of projections: conditions may change. Changing government priorities are the kind of risk of which the prospectus cautioned.

### PSLRA Safe Harbor / Bespeaks Caution Doctrine

The prospectus addressed such risks directly:

> "*Investing in an emerging economy such as Argentina entails certain inherent risks. . . . In the past, instability in Argentina has been caused by many different factors, including . . . fiscal deficits . . . .*" (Prospectus at 28; 20-F at 5)

> \*\*\*

> "*Argentina's economy has undergone a significant slowdown, and any further decline in Argentina's rate of economic growth could adversely affect our business, financial condition and results of operations. . . .* Economic conditions in Argentina from 2012 to 2015 included . . . a rising fiscal deficit and limitations on Argentina's ability to service its restructured debt . . . ." (Prospectus at 34; 20-F at 12)

---

[3] And one by Morgan Stanley on May 23 addressing the antitrust investigation referred at pp. 13-15 below.

\* \* \*

"*The Argentine government's ability to obtain
financing from international markets is limited, which
may impair its ability to implement reforms and foster
economic growth and may negatively impact our
financial condition or cash flows.*" (Prospectus at 36;
see also 20-F at 14).

\* \* \*

"*A reduction in private or public construction
projects in Argentina and/or Paraguay could have an
adverse effect on our business, financial condition
and results of operations.* . . . We cannot assure you
that the Argentine and/or Paraguayan governments will
execute the infrastructure plans as communicated."
(Prospectus at 39; 20-F at 19).

\* \* \*

"*Demand for our cement products is highly related
to residential and commercial construction in
Argentina and Paraguay and on public infrastructure
developments, which in turn, is affected by economic
conditions in those countries.* . . . As a result, a
deterioration in the economic conditions would have a
material adverse effect on our financial performance.
We cannot assure you that growth in Argentina's . . .
GDP, or the contribution to GDP growth attributable to
the construction and infrastructure sectors, will
continue at the recent pace or at all." (Prospectus at
39; 20-F at 19)

\* \* \*

"Private and public construction levels . . .
depend on investments in the region which, in turn,
are affected by economic conditions. . . . A reduction
in public infrastructure spending ... or delay in the
execution of these projects could . . . adversely
affect our business, financial condition and results
of operations." (Prospectus at 39; 20-F at 19)

The prospectus's warnings conclude (p. 55)

You should not rely upon forward-looking statements as
predictions of future events. Although we believe that

the expectations reflected in the forward-looking
statements are reasonable, we cannot guarantee that
future results, levels of activity, performance and
events and circumstances reflected in the forward-
looking statements will be achieved or will occur.

(Id. 55)

The prospectus did not mislead the buyer by concealing
unknown and nonexistent private information; and it adequately
warned prospective investors of the Argentine government's
potential reduction of public infrastructure spending.

Accordingly, plaintiffs' Rule 10b-5 claims based on the
public spending omissions are dismissed.

## B. Antitrust Omissions

The amended complaint alleges that the statements regarding
anticompetitive activities misleadlingly failed to disclose that
they were continuing:

The foregoing statements concerning CNDC
investigations of anti-competitive behavior by Loma
Negra were false and/or misleading because Defendants
knew or recklessly disregarded that Loma Negra had
continued to engage in price fixing and other
anticompetitive behavior, and that this conduct would
subject Loma Negra to heightened scrutiny from the
CNDC and other Argentinian authorities, and regulatory
action.

¶¶ 88, 90.

The amended complaint gives no factual detail about this
alleged ongoing anticompetitive behavior. It only repeats the
statements themselves:

CNDC Fine. In 1999, the Argentine Antitrust
Commission, or the CNDC, initiated administrative

investigations against the largest Argentine cement
companies, including Loma Negra, for alleged
violations of Argentine antitrust regulations by means
of an alleged mutual agreement among all companies to
fix prices and to distribute the market share among
themselves during the period from 1981 to 1999,
causing a potential damage to the general economic
interest. On July 25, 2005, the CNDC determined that
Loma Negra and Cementos San Martín (a company acquired
by, and merged into, Loma Negra in 1992), together
with other cement companies, violated these
regulations and imposed a fine against Loma Negra in
the aggregate amount of Ps.167.2 million. This
resolution by the CNDC was appealed and finally
confirmed in 2013 by the Argentine National Supreme
Court of Justice, and Loma Negra paid the fine.

CNDC Market Investigation (C. 1476). In 2013, the CNDC
initiated administrative investigations related to the
price of cement. To this end, the CNDC requested
information from all cement companies involved in the
1999 investigation. In June 2014, the CNDC removed
Loma Negra as a party to the investigative proceeding
and confirmed that it is a market investigation where
the cement companies do not have access to the file.
As of the date of this prospectus, the case is under
analysis by the CNDC.

CNDC Market Investigation (C. 1491). In 2014, the CNDC
initiated a market investigation that involved all
construction materials companies. However, no
particular company has been charged or is subject to
investigation for anti-competitive behavior. In March
and June 2014, Loma Negra submitted all the
information requested by the Antitrust Commission. As
of the date of this prospectus, the case is under
analysis by the CNDC.

CNDC Investigation—Abuse of Dominant Position (C.
1488). In 2014 the Association of Small- and Micro-
Enterprises (Asociación de Pequeñas y Micro Empresas)
filed a claim against cement, steel and aluminum
companies (including Loma Negra) for alleged abuse of
dominant market position and artificial increases in
product prices. In March 2016, Loma Negra filed an
answer against the complaint and denied all claims,
which was rejected by the CNDC on August 25, 2017. We
plan to file a motion for reconsideration against this

14

administrative decision. If the CNDC decision becomes
final, the CNDC will move forward with its
investigation, which might result in a judicial
accusation against steel and aluminum companies
(including Loma Negra) of breaches of antitrust laws.

CNDC Investigation—Competitive Conditions in Cement
Market. On August 10, 2017, we were notified of a new
administrative investigation initiated by the CNDC
regarding competitive conditions in the cement market
in Argentina. The CNDC has requested us to file
several information and documentation related to
products that we commercialized. As of the date of
this prospectus, the case is under analysis by the
CNDC.

Am. Compl. ¶¶ 87 (quoting prospectus), 89 (quoting 2017
annual report).

The amended complaint sets forth no reason to believe these

accounts of pending investigations are not truthful, and no

reason to infer that the underlying conduct, if it occurred, is

continuing, to Loma Negra's knowledge.

The claims based on alleged "Antitrust Omissions" are

dismissed.

## II. Securities Act Claims

### A. Section 11

For the reasons stated in the Rule 10b-5 analysis,

plaintiffs' Section 11 claims based on the alleged public

spending and antitrust omissions do not state material omissions

and are dismissed.

Plaintiffs also allege that Loma Negra violated Section 11

of the Securities Act in its prospectus by selectively

disclosing bribery allegations levied against its affiliate CCCC

15

and parent Camargo Corrêa, downplaying Loma Negra's exposure to
potential bribery-related liability, and falsely stating, in
reference to those bribery allegations, that "CCCC's management
has conducted internal investigations with the help of external
experts and to date has not identified evidence of any
wrongdoing performed by CCCC in these countries." Am. Compl. ¶
100.

The amended complaint quotes extensively from the bribery-
related disclosures in Loma Negra's prospectus:

> CCCC and certain of its former senior management and
> employees have recently been the subjects of a
> Brazilian Federal Police investigation referred to as
> Operation Car Wash, which is an investigation into
> widespread allegations of corruption, including at the
> Brazilian federal government controlled national oil
> company Petróleo Brasileiro S.A.—Petrobras, where
> certain of its employees accepted bribes from a number
> of construction companies, including CCCC.

> In connection with the Operation Car Wash
> investigation and comprehensive internal
> investigations undertaken by CCCC with the assistance
> of external experts, CCCC and certain of its former
> senior management and employees entered into leniency
> and plea bargain agreements with the Brazilian
> authorities pursuant to which they admitted to
> violations of Brazilian antitrust and anti-corruption
> laws and agreed to pay compensation totaling more than
> 800 million Brazilian reals , which included fines and
> other indemnification, and committed to continue to
> cooperate with Brazilian authorities. In addition,
> CCCC continues to conduct internal investigations on
> an ongoing basis regarding its anti-corruption
> compliance.

> The news of Operation Car Wash also had repercussions
> in other Latin America countries where CCCC operates
> besides Brazil, including Peru, Argentina and
> Venezuela. According to certain media reports,

government investigations are underway in those countries for alleged acts of corruption involving Brazilian construction companies. <u>CCCC's management has conducted internal investigations with the help of external experts and to date has not identified evidence of any wrongdoing performed by CCCC in these countries.</u>

Any additional violations of anti-corruption and/or antitrust laws involving CCCC may result in additional fines and/or indemnification obligations. <u>In addition, any additional adverse events or developments could have a material adverse impact on CCCC and the Camargo Corrêa group, which may subject us to reputational damage and could materially adversely affect the trading price of our ordinary shares and ADSs. Moreover, although we have been informed by CCSA and its counsels that CCCC should be solely liable for any violations by CCCC of antitrust and/or anti-corruption laws, no assurances can be given that affiliates of CCCC will not also be found to be liable for any such violations of law.</u>

Am. Compl. ¶ 100 (emphasis in complaint).

In support of plaintiffs' allegation that the foregoing was materially false and misleading, the amended complaint cites the following bribery allegations beyond those disclosed in the prospectus:

103. In early 2008, Argentina's state-run water and sanitation company, Agua y Saneamientos Argentinos ("AySA") announced that it would be accepting bids for the construction of the "Bicentenario" water treatment plant in Berazategui, in Buenos Aires province.

104. To secure the bid for the Bicentenario, Camargo Corrêa formed a joint partnership with Esuco S.A., an Argentinian construction firm headed by Carlos Wagner, a close associate of then-Argentine president Nestor Kirchner.

105. Wagner, in addition to being head of Esuco, was also the head of the Argentina Chamber of Commerce for Construction ("Camarco").

17

106.   Throughout 2017 and 2018, in response to the revelations of Operation Car Wash, Argentine authorities conducted investigations of public works projects in Argentina, including the Bicentenario.

107.   On June 21, 2017, the Argentine Prosecutor's Office sought an inquest in the Argentine courts of numerous individuals, including Wagner, and Camargo Corrêa executives Jaime José Juraszek Junior and Sergio Gabriel Chividini (signatories to the Bicentenario project contract), along with several other executives in the construction industry.

108.     These investigations revealed numerous instances of Camargo Corrêa and CCCC representatives paying bribes to Argentine government officials in connection with the Bicentenario project.

109.     In August 2018, press reports in Argentina revealed the "Notebook Scandal", which concerns a number of spiral notebooks maintained by a driver for an Argentine public works official that detail extensive bribery payments (approximately $160 million) in connection with the procurement of government contracts, including those related to the Bicentenario.

110.     In addition, in 2018 Argentine officials revived a dormant Brazilian investigation known as "Operation Sand Castle" (Operação Castelo de Areia), which Brazilian authorities had commenced in 2009 and focused on Camargo Corrêa. During the Operation Sand Castle investigation, Brazilian authorities found a pen drive and notebook belonging to Pedro Giavina Bianchi, a CCCC executive, which detailed CCCC's bribes to government officials, including in Argentina. The public first learned of these details when a collective of South American journalists published the information regarding Operation Sand Castle in September 2018.

Cautionary language in the prospectus about these investigations and proceedings concerning a different corporate entity are clear and adequate:

> Any additional violations of anti-corruption
> and/or antitrust laws involving CCCC may result in
> additional fines and/or indemnification obligations.
> In addition, any additional adverse events or
> developments could have a material adverse impact on
> CCCC and the Camargo Corrêa group, which may subject
> us to reputational damage and could materially
> adversely affect the trading price of our ordinary
> shares and ADSs. Moreover, although we have been
> informed by CCSA and its counsels that CCCC should be
> solely liable for any violations by CCCC of antitrust
> and/or anti-corruption laws, no assurances can be
> given that affiliates of CCCC will not also be found
> to be liable for any such violations of law.

Prospectus 55.

Thus, plaintiffs' Section 11 claims that Loma Negra
knowingly omitted material facts about or made false or
misleading statements in its prospectus about its affiliate
CCCC's and parent company Camargo Corrêa's alleged bribery are
dismissed.

### B. Section 12

A claim brought under Section 12(a)(2) of the Securities
act requires a security offering "which includes an untrue
statement of a material fact or omits to state a material fact
necessary in order to make the statements, in the light of the
circumstances under which they were made, not misleading (the
purchaser not knowing of such untruth or omission) . . . ." 15
U.S.C. § 77l(a)(2).

For the reasons stated in the Rule 10b-5 and Section 11
analysis, plaintiffs' Section 12 claims do not state material
omissions and are dismissed.

## C. Section 15

As Section 15 merely creates derivative control person liability for violations of Sections 11 and 12, plaintiffs' Section 15 claims are dismissed.

### CONCLUSION

Defendants' motion to dismiss the amended complaint (Dkt. No. 48) is granted in its entirety.


So ordered.

Dated: New York, New York
       April 27, 2020


_____
       LOUIS L. STANTON
       U.S.D.J.